IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| CAROL C. SUSSEL, | ) | Civ. No. 05-00444 ACK/KSC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL WYNNE, Secretary of | ) | |
| the Air Force, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL DISMISSAL AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.   Background**

Carol C. Sussel ("Plaintiff") brings this action against Secretary of the Air Force Michael Wynne ("Defendant") for employment discrimination.[1]  The gravamen of Plaintiff's complaint is that as a Chinese-Japanese female, she was subjected to discrimination by her superiors at Hickam Air Force Base and, as a result of the discrimination and in retaliation for complaining about that discrimination, was reassigned to a different job and then subsequently terminated from employment.

---

[1]Plaintiff originally named former Acting Secretary of the Air Force Michael Dominguez as the defendant in this case.  Since Michael Wynne became Secretary of the Air Force in November 2005, the parties have agreed to substitute Secretary of the Air Force Michael Wynne as the named Defendant in this case.

The First Amended Complaint alleges two "claims for
relief": (1) "race, color, national origin, gender and reprisal
discrimination" in violation of Title VII of the Civil Rights Act
of 1964, as amended, 42 U.S.C. § 2000e-1, <u>et seq.</u> and (2)
violation of the Freedom of Information Act, 5 U.S.C. § 552, <u>et
seq.</u>  <u>See</u> First Amended Complaint at 11-12 (Mar. 21, 2006).  On
June 13, 2006, the Court dismissed the Freedom of Information Act
claim pursuant to the parties' stipulation.  <u>See</u> Stipulation To
Dismiss Plaintiff's Freedom of Information Act Claims with
Prejudice, Order (June 13, 2006).

On June 7, 2006, Defendant filed a Motion for Partial
Dismissal, Memorandum in Support of Motion for Partial Dismissal
("Motion to Dismiss"), and Concise Statement of Material Facts in
Support of Defendant's Motion for Partial Dismissal.  On August
10, 2006, Plaintiff filed a Memorandum in Opposition to
Defendant's Motion for Partial Dismissal ("Opposition to Motion
to Dismiss") and a Separate and Concise Statement of Facts in
Opposition to Defendant's Motion for Partial Dismissal.  On
August 14, 2006, Defendant filed a Reply to Plaintiff's
Opposition to Defendant's Motion to Dismiss and a Concise
Statement in Support of Defendant's Reply to Plaintiff's
Opposition to Defendant's Motion to Dismiss.

On June 7, 2006, Defendant filed a Motion for Summary
Judgment, Memorandum in Support of Motion for Summary Judgment

("Motion for Summary Judgment"), and Concise Statement of Material Facts in Support of Defendant's Motion for Summary Judgment ("Defendant's MSJ Concise Statement").  On August 10, 2006, Plaintiff filed a Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Opposition to Motion for Summary Judgment") and a Separate and Concise Statement of Facts in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's MSJ Concise Statement").  On August 17, 2006, Defendant filed a Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Reply to Motion for Summary Judgment") and a Concise Statement of Material Facts in Support of Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment.

On August 28, 2006, the Court held a hearing on the Motion to Dismiss and Motion for Summary Judgment.

## II.  Defendant's Motion to Dismiss

### A.    Standard for Motion to Dismiss for Lack of Subject Matter Jurisdiction

A court's subject matter jurisdiction may be challenged under Federal Rule of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"). "A party invoking the federal court's jurisdiction has the burden of proving the actual existence of subject matter jurisdiction." See Thompson v. McCombe, 99 F.3d 352, 353 (9th Cir. 1996).

On a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the court is not "restricted to the

3

face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." McCarthy v. United States, 850 F.2d 558, 560 (9th Cir. 1988).  "Once the moving party [converts] the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." Savage v. Glendale Union High Sch., 343 F.3d 1036, 1040 n.2 (9th Cir. 2003).

"The requirement that the nonmoving party present evidence outside his pleadings in opposition to a motion to dismiss for lack of subject matter jurisdiction is the same as that required under Rule 56(e) that the nonmoving party to a motion for summary judgment must set forth specific facts, beyond his pleadings, to show that a genuine issue of material fact exists." Trentacosta v. Frontier Pac. Aircraft Indus., Inc., 813 F.2d 1553, 1559 (9th Cir. 1987).  Thus, the moving party "should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Casumpang v. Int'l Longshoremen's & Warehousemen's Union, 269 F.3d 1042, 1060-61 (9th Cir. 2001).

B.   **Discussion of Motion to Dismiss for Lack of Subject Matter Jurisdiction**

1.   **Rehabilitation Act**

The parties agree that the First Amended Complaint does not allege a claim under the Rehabilitation Act.  <u>See</u> Motion to Dismiss at 3; Opposition to Motion to Dismiss at 10 (Plaintiff "did not make, nor is now making a claim under the Rehabilitation Act"); <u>see also</u> First Amended Complaint at 7 ("Thereafter, Plaintiff's treating physicians placed the plaintiff on disability leave.").

Since Plaintiff does not oppose dismissal of any Rehabilitation Act claim that could arguably be alleged in the First Amended Complaint, the Court dismisses that claim without prejudice.

2.   **Claims Involving Hileman**

Title VII makes it illegal for an employer to discriminate against an employee "because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. 2000e-2(a).  The Title VII claim in the First Amended Complaint references Larry Hileman, describing him as someone who "played a significant role" in the events of which Plaintiff complains,[2] stating that Plaintiff (and others) have been subject to discrimination by Hileman (and Denise Hollywood and Frank

_____

[2]<u>See</u> First Amended Complaint at 3 ¶¶ 7 and 7(b).

Faria),[3/] describing a meeting in which Plaintiff was allegedly interrogated by Hileman (along with Hollywood and Faria),[4/] and stating that Hileman was the deciding official who wrote a letter sustaining Plaintiff's removal from employment.[5/]  The First Amended Complaint also states that Plaintiff filed formal complaints of discrimination against Hileman and others (including Hollywood and Faria) with the Equal Employment Opportunities Commission ("EEOC").  <u>See</u> First Amended Complaint at 10-11 ¶¶ 22, 25.

From October 2003 to March 2006, Hileman was the Deputy Director of the 15th Services Squadron at Hickam Air Force Base - the agency for which Plaintiff worked prior to her termination in 2005.  <u>See</u> Declaration of Larry Hileman at 1 (May 22, 2006) ("Hileman Decl."); <u>see also</u> First EEOC Complaint at 1 ("Name of Agency Where You Work" is listed as "15th Services Squadron" with an address at "Hickam AFB").

Defendant argues that all allegations involving Hileman should be dismissed for lack of subject matter jurisdiction because Plaintiff failed to exhaust her administrative remedies

―――――――――――

[3/]<u>See</u> <u>id.</u> at 4, 7-8 ¶¶ 9, 14.

[4/]<u>See</u> <u>id.</u> at 5 ¶ 9(e).

[5/]<u>See</u> <u>id.</u> at 8 ¶ 15.

for any such claims.  See Motion to Dismiss at 5.[6/]  According to

Defendant, "[i]n neither her informal, formal, or motion to amend

her EEO complaint does Plaintiff accuse Mr. Hileman of

discriminatory conduct," and therefore Defendant was never put on

notice of any claim against Hileman.  Motion to Dismiss at 5-6.

A plaintiff must exhaust her administrative remedies in

order to establish federal subject matter jurisdiction over Title

VII claims.  B.K.B. v. Maui Police Department, 276 F.3d 1091,

1099 (9th Cir. 2002); EEOC v. Farmer Bros. Co., 31 F.3d 891, 899

(9th Cir. 1994).  To exhaust her administrative remedies under

Title VII, a plaintiff must file a timely charge with the EEOC,

or the appropriate state agency, thereby affording the agency an

opportunity to investigate the charge.  Maui Police, 276 F.3d

1099.

A federal court has subject matter jurisdiction "over

all allegations of discrimination that either 'fell within the

scope of the EEOC's actual investigation or an EEOC investigation

which can reasonably be expected to grow out of the charge of

discrimination.'"  Maui Police, 276 F.3d at 1100 (quoting Farmer

---

[6/]Although Defendant argues that "claims against Mr.
Hileman" should be dismissed, the Court notes that no claims are
made against Hileman directly - the Secretary of the Air Force is
the only named Defendant in the case.  See Motion to Dismiss at 4
(emphasis added); see also First Amended Complaint.  Defendant's
argument thus appears to be that any allegations involving
Hileman cannot be considered by this Court in analyzing
Plaintiff's Title VII claims because those allegations were not
raised and exhausted before the EEOC.

<u>Bros.</u>, 31 F.3d at 899) (emphasis in original).  A federal court may consider allegations brought in a civil action that are like or reasonably related to charges in the EEOC complaint.  <u>Farmer Bros.</u>, 31 F.3d at 899 (holding that a claim for failure to recall and rehire was reasonably related to a subsequent charge of unlawful termination); <u>Maui Police</u>, 276 F.3d at 1100; <u>see also Deppe v. United Airlines</u>, 217 F.3d 1262, 1267 (9th Cir. 2000); <u>Gibbs v. Pierce County Law Enforcement Support</u>, 785 F.2d 1396, 1400 (9th Cir. 1986); <u>Serpe v. Four-Phase Systems, Inc.</u>, 718 F.2d 935, 937 (9th Cir. 1983); <u>Oubichon v. North American Rockwell Corp.</u>, 482 F.2d 569, 571 (9th Cir. 1973).

Furthermore,

> In determining whether a plaintiff has exhausted allegations that she did not specify in her administrative charge, it is appropriate to consider such factors as the alleged basis of the discrimination, dates of the discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred. In addition, the court should consider plaintiff's civil claims to be reasonably related to allegations in the charge to the extent that those claims are consistent with the plaintiff's original theory of the case.

<u>Maui Police</u>, 276 F.3d at 1100.  Allegations in the EEOC charge are construed liberally as they are typically made by those unfamiliar with formal pleading requirements.  <u>Id.</u>

The first EEOC complaint filed by Plaintiff on March 12, 2004 alleges that Plaintiff was discriminated against on the

basis of race, color, national origin, sex, and sexual harassment.  <u>See</u> Complaint of Discrimination in the Federal Government at 1 (March 12, 2004) ("First EEOC Complaint").  That First EEOC Complaint does not reference Hileman specifically, but does reference James G. Roche (then-Secretary of the Air Force), Beth Hodge, Denise Hollywood, and Frank Faria.  <u>Id.</u> at 1.  The First EEOC Complaint alleges discrimination by these individuals but also includes more general statements that "[t]his agency" created a hostile work environment and that "management" states that no adverse personnel actions were taken.  <u>Id.</u> at 4-5.

In particular, the First EEOC Complaint alleges that Hollywood: asked Plaintiff if she was local, Hawaiian, and whether she went to public, private, or Punahou School; asked staff members how many "Haoles"[7/] were on staff; canceled Plaintiff's selection of an employee for promotion because of his skin color (among other reasons); and relieved a "Lead Lifeguard" of color from his position and placed two unqualified, part-time, Caucasian lifeguards in supervisory positions.  <u>See</u> First EEOC Complaint at 4.  The First EEOC Complaint also alleges that Faria said "Your staff thinks you and Howard are so close, you're in bed together."  <u>Id.</u>  The First EEOC Complaint goes on to allege that Plaintiff was reassigned to the Teen Center, while two

---

[7/]"Haole" is a Hawaiian term, sometimes used derogatorily, referring to persons of the Caucasian race.  <u>See</u> <u>Maui Police</u>, 276 F.3d at 1095 n.2.

inexperienced Caucasian people were assigned to Outdoor Recreation (one to Plaintiff's former position and one as an assistant to that position).  Id.  Finally, the First EEOC Complaint alleges that while Plaintiff was on sick leave, Hodge threatened that Plaintiff's doctor must provide detailed medical information or Plaintiff would be placed on AWOL status and "appropriate action" would be taken.  Id. at 5.

The Court finds that allegations in this federal cause of action that Hileman participated in discrimination against Plaintiff are like or reasonably related to Plaintiff's allegations in the First EEOC Complaint that the "agency has created a hostile work environment and has continually harassed" Plaintiff.  See First EEOC Complaint at 4; see also Farmer Bros., 31 F.3d at 899; Maui Police, 276 F.3d at 1100.  The First Amended Complaint alleges that Hileman, Hollywood, and Faria discriminated against Plaintiff when they collectively interrogated Plaintiff at a meeting on January 6, 2004.  See First Amended Complaint at 4-5 ¶¶ 9 and 9(e).  Although Hileman was not named in the First EEOC Complaint, Hollywood and Faria were named; all three were present at the meeting of which Plaintiff complains.  The allegations in the First Amended Complaint involving Hileman are reasonably related to the allegations contained in the First EEOC Complaint and involve common facts.  In particular, the alleged basis of the

discrimination is the same, Hileman's alleged co-perpetrators of discrimination were named in the charge, and all discrimination is alleged to have occurred at Hickam Air Force Base. See Maui Police, 276 F.3d at 1100. In addition, the allegations involving Hileman are consistent with Plaintiff's original theory of the case as described in the First EEOC Complaint: Hileman was one of Plaintiff's superiors and the claim in her First EEOC Complaint is essentially that Plaintiff's superiors discriminated against her. See id.

An EEOC investigation which could reasonably be expected to grow out of the charge of discrimination would have included investigation of actions by Hileman, especially since Plaintiff was subsequently discharged from employment by Hileman. Maui Police, 276 F.3d at 1100. Moreover, the adverse employment action that Plaintiff alleged in the First EEOC Complaint as having been threatened by Hodge would likely have had to go through Hileman since he was the Deputy Director of Plaintiff's agency; thus, again, an EEOC investigation which could reasonably be expected to grow out of the charge of discrimination would have included investigation of actions by Hileman. In fact, Defendant's counsel agreed at the hearing that the EEOC investigation did encompass an investigation of Hileman's role in the alleged discrimination against Plaintiff.

Additionally, Plaintiff filed a second EEOC complaint on May 12, 2005, in which she specifically named Hileman, Hollywood, Faria, and Raymond Torres as having discriminated against her. See Complaint of Discrimination in Federal Government at 1-2 (May 12, 2005) ("Second EEOC Complaint"). With respect to Hileman, Plaintiff stated that Hileman wrote a letter dated March 3, 2005 stating that as the deciding official, he was sustaining Plaintiff's proposed removal from employment. Id. at 2. Plaintiff alleged that the removal constituted unlawful discrimination based on race, color, national origin, and sex, and unlawful reprisal for her prior EEO activity. Id.

Any EEOC investigation which could reasonably be expected to grow out of the charges of discrimination and retaliation contained in the Second EEOC Complaint would have included investigation of actions by Hileman, since the Second EEOC Complaint identified him specifically as discriminating and retaliating against Plaintiff in terminating her employment. Maui Police, 276 F.3d at 1100.[8]

For these reasons, the Court denies Defendant's motion to dismiss the allegations involving Hileman.

---

[8]/The Court notes that once 120 days had passed without any EEOC action after Plaintiff filed her Second EEOC Complaint, Plaintiff amended the complaint in the federal court case to include claims regarding her termination from employment. See generally First Amended Complaint; Stipulation as to Plaintiff's Motion to Amend and Supplement Complaint (March 9, 2006).

**C.   Discussion of Motion to Dismiss for Failure to State a Claim**

In a Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of a provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56."  Fed. R. Civ. P. 12(b).

Defendant seeks dismissal for failure to state a claim upon which relief can be granted of two aspects of Plaintiff's Title VII claim.  <u>See</u> Motion to Dismiss at 6, 12 (seeking dismissal on "causes of action" at First Amended Complaint ¶¶ 9(c) and (d)).  However, the parties rely extensively on matters outside the pleadings in arguing for and against dismissal for failure to state a claim, and support their arguments with concise statements of fact, which may only be filed in summary judgment proceedings.  <u>See</u> L.R. 56.1.  At the hearing, the parties agreed that the motion to dismiss should be treated as a motion for summary judgment.

Accordingly, pursuant to Rule 12(b), the Court finds that the motion to dismiss for failure to state a claim should be treated as a motion for summary judgment; since Defendant filed a separate Motion for Summary Judgment seeking summary judgment on all claims, the Court will deny the Motion to Dismiss as to these

13

two claims and instead consider the merits of the claims as part of the Motion for Summary Judgment.  Accordingly, Defendant's motion to dismiss for failure to state a claim in paragraphs 9(c) and 9(d) of the First Amended Complaint is denied.

**III. Defendant's Motion for Summary Judgment**

**A.    Standard for Motion for Summary Judgment**

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[9/]  Fed. R. Civ. P. 56(c).

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A genuine issue of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving

---

[9/] Affidavits made on personal knowledge and setting forth facts as would be admissible at trial are evidence that a court may consider when determining whether a material issue of fact exists.  Fed. R. Civ. P. 56(e).  Legal memoranda and oral argument are not evidence and do not create issues of fact.  See British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978).

party.'"[10/]   Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 310 F.3d 1188, 1194 (9th Cir. 2002) (quoting Union Sch. Dist. v. Smith, 15 F.3d 1519, 1523 (9th Cir. 1994)) (internal citations omitted).   Conversely, where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"   Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

The moving party has the burden of persuading the Court as to the absence of a genuine issue of material fact.   Celotex, 477 U.S. at 323.   The moving party may do so with affirmative evidence or by "'showing'--that is pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case."   Id. at 325.   All evidence and reasonable inferences drawn therefrom are considered in the light most favorable to the nonmoving party.   See, e.g., T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).   So, too, the Court's role is not to make credibility assessments.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).   Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied.   Id. at 250-51.

---

[10/] Disputes as to immaterial issues of fact do "not preclude summary judgment."   Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1478 (9th Cir. 1986).

Once the moving party satisfies its burden, however, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  See Celotex, 477 U.S. 322-23; Matsushita Elec., 475 U.S. at 586; Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).  Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); see also T.W. Elec. Serv., 809 F.2d at 630.  The nonmoving party must instead set forth "significant probative evidence" in support.  T.W. Elec. Serv., 809 F.2d at 630. Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.[11/]  See Celotex, 477 U.S. at 322.

―――――――――――――

[11/] When the moving party also has the burden of proof in an element of a claim, it has the "burden of establishing a prima facie case on the motion for summary judgment."  UA Local 343 of the United Ass'n of Journeymen v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1995).  Upon showing a prima facie case, the burden of production shifts and it becomes "incumbent on [the nonmoving party] to 'set forth specific facts showing that there is a genuine issue for trial,' by evidence cognizable under that rule."  Id. (quoting Fed. R. Civ. P. 56(e)); Charles Alan Wright et al., Federal Practice & Procedure § 2727 (3d ed. 1998).  The ultimate burden of persuasion as to the non-existence of any genuine issues of material fact remains on the moving party. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000); accord Dye v. United States, 121 F.3d 1399, 1409 (10th Cir. 1997).

B.    **Discussion of Defendant's Motion for Summary Judgment**[12]

Plaintiff alleges that she was discriminated against in violation of Title VII on the basis of her race, color, sex, and national origin.  See First Amended Complaint at 1.  As discussed above, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Plaintiff's allegations of discrimination are based on theories of disparate treatment, hostile work environment, retaliation/reprisal, and sexual harassment.  The Court will examine each of these theories separately.

1.    **Disparate Treatment Based on Race, Color and National Origin: Detail to the Teen Center**

"A person suffers disparate treatment in his [or her] employment when he or she is singled out and treated less favorably than others similarly situated on account of" a protected characteristic.  Cornwell, 439 F.3d at 1028 (citing McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1121 (9th Cir. 2004)

_____

[12]/The Court notes that while it may refer to facts as having been established for purposes of this summary judgment analysis, the Court does not purport to make any factual findings that would apply beyond this summary judgment motion.  The Court recognizes that additional evidence may be presented by the parties in subsequent motions and/or at trial; therefore, any factual findings made in this order are not meant to be the law of the case.

(internal quotation marks omitted)).  To prevail in a disparate treatment claim, a plaintiff must "prove that the employer acted with conscious intent to discriminate."  <u>Costa v. Desert Palace, Inc.</u>, 299 F.3d 838, 854 (9th Cir. 2002) (<u>citing</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 805-06 (1973)).

When a defendant moves for summary judgment, the plaintiff alleging disparate treatment under Title VII may respond in one of two ways.  <u>McGinest</u>, 360 F.3d at 1122; <u>Costa</u>, 299 F.3d at 855.  On one hand, a plaintiff may provide direct or circumstantial[13/] evidence "that a discriminatory reason more likely motivated the employer" to engage in disparate treatment. <u>McGinest</u>, 360 F.3d at 1122; <u>Costa</u>, 299 F.3d at 855.  In the alternative, the plaintiff may survive summary judgement by engaging in the <u>McDonnell Douglas</u> burden shifting analysis. <u>Cornwell</u>, 439 F.3d at 1028; <u>McGinest</u>, 360 F.3d at 1122.  In this case, Plaintiff has elected to engage in the <u>McDonnell Douglas</u>

---

[13/]  The Court notes that the Ninth Circuit has recently identified a tension in its current jurisprudence as to the quality of circumstantial evidence required for plaintiffs to survive summary judgment in Title VII employment discrimination cases.  <u>Cornwell</u>, 439 F.3d at 1030-31.  At issue is whether circumstantial evidence need be "substantial and specific" as has been the case in the past, <u>see</u> <u>id.</u> at 1030 n. 9; <u>Dominguez-Curry v. Nev Transp. Dep't</u>, 424 F.3d 1027, 1038 (9th Cir. 2005); <u>Coghlan v. Am. Seafoods Co.</u>, 413 F.3d 1090, 1095 (9th Cir. 2005); <u>Bodett v. CoxCom, Inc.</u>, 366 F.3d 736, 743 (9th Cir.); <u>Stegall v. Citadel Broad. Co.</u>, 350 F.3d 1061, 1065-67 (9th Cir. 2003), or if a diminished standard now exists as a result of <u>Costa v. Desert Palace</u>, 539 U.S. 90, 100, 123 S.Ct. 2148, 2154 (2003) (holding that direct and circumstantial evidence should be treated alike).

burden shifting analysis.  See Opposition to Motion for Summary Judgment at 4-5.

Under the McDonnell Douglas analysis, a plaintiff must first establish a prima facie case of discrimination.  McGinest, 360 F.3d at 1122; Burdine, 450 U.S. at 254.  "The burden of establishing a prima facie case of disparate treatment is not onerous."  Id. at 253.  The four required elements to establish a prima facie case of disparate treatment are (1) plaintiff belongs to a protected class; (2) plaintiff was qualified for the position and was performing according to her employer's legitimate expectations; (3) plaintiff was subject to an adverse employment action; and (4) similarly situated individuals outside plaintiff's protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination.  See Vasquez v. County of Los Angeles, 349 F.3d 634, 640 n.5 (9th Cir. 2004); Fonseca v. Sysco Food Services of Arizona, Inc., 374 F.3d 840, 847 (9th Cir. 2004); Chuang v. University of California Davis, Bd. of Trustees, 225 F.3d 1115, 1123 (9th Cir. 2000); see also Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 n. 6 (1981).  By establishing the prima facie case, the plaintiff creates a presumption of discrimination.

Then, the burden of production shifts to the defendant to rebut the claim by articulating a legitimate, non-

discriminatory reason for its conduct.  <u>Cornwell</u>, 439 F.3d at 1028; <u>Raytheon Co. v. Hernandez</u>, 540 U.S. 44, 50 n. 3 (2003).  To satisfy its burden, the defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus."  <u>Raad v. Fairbanks North Star Borough School Dist.</u>, 323 F.3d 1185, 1196 (9th Cir. 2003) (quoting <u>Burdine</u>, 450 U.S. at 257)).  If the defendant produces a non-discriminatory explanation, then the presumption of discrimination is dropped and the plaintiff must satisfy the original burden of persuasion.  <u>Costa</u>, 299 F.3d at 855; <u>Burdine</u>, 450 U.S. at 255.

At the third stage of the analysis, a plaintiff can satisfy her burden by showing "that a discriminatory reason more likely motivated the employer" to engage in disparate treatment.[14/]  <u>Cornwell</u>, 439 F.3d at 1028 (<u>citing</u> <u>Burdine</u>, 450 U.S. at 256).  Or, the plaintiff can offer evidence that the "employer's proffered explanation is unworthy of credence."  <u>Burdine</u>, 450 U.S. at 256 (<u>citing</u> <u>McDonnell Douglas</u>, 411 U.S. at 804-05).  If the plaintiff is successful in either case, or genuine issues of material fact remain, then the defendant's

---

[14/]  This is the same showing that a plaintiff may make at the outset, in the alternative to engaging in the <u>McDonnell Douglas</u> burden shifting analysis.  A plaintiff has the choice to attempt to prove discriminatory motivation at either stage of the analysis.

motion for summary judgment is denied.

### a.   Prima Facie Case

Under the McDonnell Douglas framework set forth above, the Court finds that Plaintiff has established a prima facie case of disparate treatment based on race, color, and national origin with respect to her detail to the Teen Center.

### i.   Protected Class

Defendant does not dispute that, as a Japanese-Chinese person, Plaintiff is a member of a protected class based on her race, color and national origin.   Thus, Plaintiff satisfies the first element of the prima facie case.

### ii.   Performance According to Expectations

The second element that Plaintiff must show to establish a prima facie case of disparate treatment is that she was qualified for her job and was performing her job according to her employer's legitimate expectations.   See Vasquez, 349 F.3d at 640 n.5; Chuang, 225 F.3d at 1123; Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998).   Plaintiff managed Outdoor Recreation, an activity at Hickam Air Force Base, beginning in 2003; her position has been referred to as "chief" of Outdoor Recreation.   See Declaration of Carole C. Sussel at 4-5, 31 (Aug. 8, 2006) ("Sussel Decl.").

Defendant argues that Plaintiff has not demonstrated that she was performing up to her employer's legitimate

expectations because the Outdoor Recreation activity, which she was supervising, yielded operating losses of -12% net income after depreciation ("NIAD") for fiscal year 2003 (October 1, 2002 to September 30, 2003) and of -22% NIAD for the first fiscal quarter of 2004 (October 1, 2003 to December 2003).  See Motion for Summary Judgment at 23-24; see also Declaration of Marivic Penman at 2 (May 22, 2006) ("Penman Decl.").  According to Defendant, the Outdoor Recreation activity was expected to generate revenue and Hickam Air Force Base's higher headquarters had a revenue goal of 7-25% NIAD profit for Hickam's Outdoor Recreation activity.  See Penman Decl. at 1-2.

Additionally, Defendant argues that Plaintiff was not performing up to her employer's legitimate expectations because Plaintiff's supervisors had received complaints and had concerns about her management style.  See Motion for Summary Judgment at 24-25; see also Declaration of Denise Hollywood at 2-3 (June 2, 2006).

The Ninth Circuit has emphasized that the requisite degree of proof necessary to establish a prima facie case for Title VII claims on summary judgment is minimal and does not even rise to the level of a preponderance of the evidence.  Coughlan v. American Seafoods Co. LLC, 413 F.3d 1090, 1094 (9th Cir. 2005); Aragon v. Republic Silver State Disposal, Inc., 292 F.3d 654, 659 (9th Cir. 2002).  Under this minimal standard, the Court

22

finds that Plaintiff has demonstrated - for purposes of establishing a prima facie case - that she was qualified for her job and was performing her job according to her employer's legitimate expectations.  See Coughlan, 413 F.3d at 1094; Aragon, 292 F.3d at 659.

Plaintiff has presented evidence that she possesses the training, licenses, and background to qualify her for the job as the chief of Outdoor Recreation and that her appraisals and personnel records over the past twenty-two years have been outstanding.  See Sussel Decl. at 4-5, 31; Declaration of Amy Cawvey at 5 (July 17, 2006) ("Cawvey Decl."); see also Aragon, 292 F.3d at 659 (employee's self-assessment is relevant evidence).

Plaintiff has presented evidence, through a declaration of her former direct supervisor (Mary Anne Seidl), that Plaintiff was performing her job as chief of Outdoor Recreation according to her employer's legitimate expectations.  For example, Seidl states that Plaintiff's performance as chief of Outdoor Recreation was typically "above and beyond" and that Plaintiff's "specialized knowledge and experience were an essential contribution" to the agency.  See Declaration of Mary Anne Seidl at 12 ("Seidl Decl."); see also Cawvey Decl. at 5.  Seidl also states that Outdoor Recreation faced significant staffing problems not attributable to Plaintiff, that no one in

Plaintiff's position would have been able to run Outdoor Recreation alone (as Plaintiff was doing), and that some or all of the complaints made against Plaintiff were unfounded.  Id. at 7, 8-9, 11, 13-16.

Additionally, Plaintiff has presented some evidence that Outdoor Recreation is not expected to generate revenue, but is a weather-dependant, seasonal activity that may generate profit in months with good weather and operate at a loss in months with poor weather (for example, heavy winds or rain).  See Sussel Decl. at 34; Plaintiff's MSJ Concise Statement at 1, ¶¶ 9-10; Plaintiff's MSJ Concise Statement, Exhibit S at 6775. Plaintiff has also presented some evidence that operating losses may have been attributable to heightened security and related issues after the terrorist attacks of September 11, 2001.  See Sussel Decl. at 25.  The Court finds that Plaintiff has raised an issue of fact as to whether performance as chief of Outdoor Recreation can be tied to operating losses.

In summary, Plaintiff has met her burden of demonstrating - for purposes of establishing a prima facie case - that she was qualified for her job and was performing her job according to her employer's legitimate expectations.

### iii. Adverse Employment Action

The parties agree that effective January 7, 2004, Hollywood detailed Plaintiff to be the director of the Teen

Center for some period of time,[15/] thereby temporarily removing

her from her position as Chief of Outdoor Recreation.  See

Defendant's MSJ Concise Statement at ¶ 25; Plaintiff's MSJ

Concise Statement at ¶ 25; Hollywood Decl. at 4; Sussel Decl. at

28.  Defendant argues that this change in detail did not

constitute an adverse employment action because the assignment

was only temporary and Plaintiff maintained her base pay.  See

Motion for Summary Judgment at 26-27.  Defendant, however, admits

that the Teen Center position was a GS-9 level position, 2 grades

lower than Plaintiff's prior position as chief of Outdoor

Recreation.  Id. at 27.

        Given the minimal standard of proof required at the

prima facie stage, the Court finds that Plaintiff has satisfied

the third element of her Title VII prima facie case by

demonstrating that she was subjected to an adverse employment

action when she was detailed to the Teen Center because the Teen

Center position was a lesser level position (a GS-9 position),

and thus a less senior and less desirable position.  See Fonseca,

_____

        [15/]The parties do not agree completely on the specific length
of the detail.  According to Plaintiff, Hollywood told her on
January 6, 2004 that she would be detailed to the Teen Center for
"120 days."  See Sussel Decl. at 28.  According to Hollywood, on
January 7, 2004, Plaintiff was detailed to the Teen Center for "a
minimum of 120 days."  See Hollywood Decl. at 4.  At a staff
meeting on January 8, 2004, Hollywood stated that Plaintiff's
replacement (Julie Klembara) was "out here for 120 days, longer
if I can keep her."  See Plaintiff's MSJ Concise Statement,
Exhibit RR at 8.

374 F.3d 840, 847 (defining adverse employment action broadly).

Additionally, Plaintiff has demonstrated (for purposes of establishing a prima facie case) that detail to the Teen Center was an adverse employment action because the Teen Center position did not award premium weekend pay on top of base pay; Plaintiff has submitted evidence that the Outdoor Recreation position paid Plaintiff premium weekend pay in addition to base pay. See Plaintiff's MSJ Concise Statement, Exhibit C at 30, 34; see also Fonseca, 374 F.3d at 847 ("adverse employment action exists where an employer's action negatively affects its employee's compensation").

Finally, Hollywood's statements at the staff meeting on January 8, 2004 could be interpreted to reflect negatively on Plaintiff and indicate that Plaintiff's detail was a result of negative performance - indicating that the detail was a demotion. See Plaintiff's MSJ Concise Statement, Exhibit RR at 2-8.

### iv. Similarly Situated Individuals Outside of Plaintiff's Protected Class and Other Circumstances

As previously noted, the requisite degree of proof necessary to establish a prima facie case for Title VII claims on summary judgment is minimal and does not even rise to the level of a preponderance of the evidence. Coughlan, 413 F.3d at 1094. Given this minimal standard, Plaintiff has presented sufficient evidence that similarly situated individuals outside of

Plaintiff's protected class were treated more favorably than Plaintiff.  See Opposition to Motion for Summary Judgment at 16-23.[16/]

Individuals are similarly situated when they have similar jobs and display similar conduct.  Vasquez, 349 F.3d at 641.  Tom Guthrie - a Caucasian - managed the Officer's Club. See Plaintiff's MSJ Concise Statement, Exhibit X at 27-29. Defendant agrees that Guthrie was similarly situated to Plaintiff and outside of Plaintiff's protected class.  See Reply to Motion for Summary Judgment at 6 (stating that Guthrie is an "appropriate comparator").  Guthrie's activity (the Officer's Club) operated at a loss for four consecutive fiscal quarters at least twice between 2000 and 2005.  See Plaintiff's MSJ Concise Statement, Exhibit X at 23-25.  Despite these losses, Guthrie was not subjected to any adverse employment action.  Guthrie was told by his supervisor (Faria) that "if he wasn't able to meet the financial plan to get better [sic], that he needed to be looking for a job because we wouldn't be able to continue to do that," but no action was taken against Guthrie.  Id. at 26-27.  In contrast, Plaintiff was subjected to an adverse employment action

_____

[16/]Defendant states in the Motion for Summary Judgment that Plaintiff compares herself to Doug Gianetti.  See Motion for Summary Judgment at 27.  However, since Plaintiff's opposition makes no reference to Gianetti and Plaintiff's counsel made no reference to Gianetti at the hearing, the Court will not consider whether Gianetti is similarly situated to Plaintiff.

(a change in detail) after her activity operated at a loss for a fiscal year and a quarter.[17]   The Court finds that, for purposes of establishing a prima facie case, Guthrie was treated more favorably than Plaintiff.

Rose Mielke - a Caucasian - has managed the Sea Breeze Restaurant since 2002.  Id. at 32.  Defendant does not address whether Mielke is similarly situated to Plaintiff, but does agree that activity managers (like club managers) are similarly situated to Plaintiff.  See Reply to Motion for Summary Judgment

---

[17]/Outdoor Recreation yielded operating losses of -12% NIAD for fiscal year 2003 (October 1, 2002 to September 30, 2003) and of -22% NIAD for the first fiscal quarter of 2004 (October 1, 2003 to December 2003).  See Motion for Summary Judgment at 23-24; see also Penman Decl. at 2.  Plaintiff became the "chief" or manager of Outdoor Recreation sometime in calendar year 2003. See Sussel Decl. at 5.  Thus, Plaintiff was not the manager of Outdoor Recreation for the entire 2003 fiscal year; at most, she was manager for the final three quarters of fiscal year 2003 in addition to the first quarter of fiscal year 2004.  In other words, while Plaintiff managed Outdoor Recreation, it operated at a loss for at most four consecutive fiscal quarters.  As noted, Guthrie's activity operated at a loss for four consecutive fiscal quarters at least twice between 2000 and 2005.  See Plaintiff's MSJ Concise Statement, Exhibit X at 23-25.  Although Defendant's counsel argued at the hearing that Plaintiff has not proven that Plaintiff and club managers (Tom Guthrie, Rose Mielke, and Cindy Bernier) were under the same supervisors as Plaintiff at the time of their clubs' operating losses, the Court finds that Plaintiff has put forth sufficient evidence for purposes of establishing a prima facie case.  Plaintiff has presented evidence that Faria, for example, acted in a supervisory capacity over Plaintiff beginning in at least October 2003 and that he acted in a supervisory authority over the club managers from 2000 to present.  See Plaintiff's MSJ Concise Statement, Exhibit X at 14-18; Plaintiff's MSJ Concise Statement, Exhibit A at 1; Declaration of Francisco Faria at 1 (May 24, 2006) ("Faria Decl.").

28

at 6.  The Court finds that as a club manager, Mielke is similarly situated to Plaintiff; as a Caucasian, she is outside of Plaintiff's protected class.  Mielke's activity (the Sea Breeze Restaurant) operated at a loss for four consecutive fiscal quarters at least twice since 2002.  <u>See</u> Plaintiff's MSJ Concise Statement, Exhibit X at 32-33.  Despite these losses, Mielke was not subjected to any disciplinary action and was never detailed to a different position.  <u>Id.</u> at 33.  In contrast, Plaintiff was subjected to an adverse employment action after her activity operated at a loss.  The Court finds that, for purposes of establishing a prima facie case and based on these facts which are not contested, Guthrie was treated more favorably than Plaintiff.

Cindy Bernier - a Filipino-Caucasian - has managed the Enlisted Men's Club since at least 2000.  <u>Id.</u> at 27-28. Defendant agrees that Bernier is similarly situated to Plaintiff, but argues that she is a member of Plaintiff's protected class. <u>See</u> Reply to Motion for Summary Judgment at 6.  Plaintiff and Bernier are not of the same race or national origin; Bernier is part Caucasian and Plaintiff is not.  Plaintiff has raised an issue of fact as to whether Bernier would have been treated as a Caucasian or as a non-Caucasian.  The Court finds that the evidence submitted by Plaintiff that Bernier is outside of Plaintiff's protected class supports Plaintiff's prima facie case

because Plaintiff has demonstrated that Bernier was treated more favorably than Plaintiff.  See Porter v. California Dep't of Corrections, 419 F.3d 885, 896 (9th Cir. 2005) (evidence establishing genuine issue of fact can support plaintiff's prima facie case under Title VII).  Like Guthrie and Mielke, the activity that Bernier managed operated at a loss for four consecutive fiscal quarters at least twice in the past five years.  See Plaintiff's MSJ Concise Statement, Exhibit X at 27-28.  Despite these losses, Bernier was not subjected to any adverse employment action and was never detailed to a different position.  Id.

Julie Klembara - a Caucasian - managed the Community/Youth Program, which includes the Community Center and Youth program.  See Declaration of Julie Klembara at 1 (May 24, 2006) ("Klembara Decl.").  Defendant argues that Klembara was not similarly situated to Plaintiff because Klembara was "a successful manager," as evidenced by the profit earned by the Community Center.  See Opposition to Motion for Summary Judgment at 5; see also Penman Decl. at 2 (Community Center had a profit of 8% NIAD for 2003 fiscal year).  However, according to Plaintiff, the Community Center was not operating successfully because it had received violations for not being in compliance with federal government regulations.  See Sussel Decl. at 30.  Despite these violations, Klembara was favorably detailed into

Plaintiff's position at Outdoor Recreation - a position which was meant to advance Klembara's career.  See Plaintiff's MSJ Concise Statement, Exhibit RR at 8 (minutes of Jan. 8, 2004  staff meeting in which Hollywood stated that Klembara's detail into the position of Outdoor Recreation chief would help Klembara's career).  Plaintiff, on the other hand, was treated less favorably because she was detailed to a less favorable position (as discussed supra).  The Court need not determine at this time whether Klembara was similarly situated because the Court has already found that Guthrie and Mielke were similarly situated to Plaintiff, outside of Plaintiff's protected class, and treated more favorably than Plaintiff.

Plaintiff has not demonstrated that Faria was similarly situated to Plaintiff.  Faria was a flight chief, not an activity manager.  See Plaintiff's MSJ Concise Statement, Exhibit A and Exhibit X at 15.  According to Plaintiff's organizational charts, a flight chief is in a supervisory position to an activity manager such as the director of Outdoor Recreation.  See Plaintiff's MSJ Concise Statement, Exhibit A.  Accordingly, the Court finds that Plaintiff and Faria are not similarly situated.  See Vasquez, 349 F.3d at 641 ("Employees in supervisory positions are generally deemed not to be similarly situated to lower level employees.").

Plaintiff's discussion of the treatment of Caucasian lifeguards (Albert Fernandez, Frank Supranovich, and Brian Schafer) is irrelevant to the analysis of similarly situated individuals because these individuals were not similarly situated to Plaintiff - she held a supervisory position over the lifeguards.  See Vasquez, 349 F.3d at 641.

Finally, the Court finds that even if Guthrie, Mielke, Bernier, and Klembara are not similarly situated (and thus Plaintiff has not demonstrated that similarly situated individuals outside of Plaintiff's class have been treated more favorably than Plaintiff), Plaintiff has satisfied the fourth prong of the prima facie analysis because Plaintiff has demonstrated that "other circumstances surrounding the adverse employment action give rise to an inference of discrimination." See Fonseca, 374 F.3d at 847.  Those particular circumstances are examined in detail, infra, in section III.B.1.c. ("Plaintiff's Rebuttal").  Drawing inferences in Plaintiff's favor, the Court holds that the circumstances surrounding the adverse employment action give rise to an inference of discrimination sufficient to establish the fourth prong of the prima facie case.  Fonesca, 374 F.3d at 849.

In summary, the Court finds that Plaintiff has established a prima facie case of disparate treatment based on race, color and national origin.  Thus, the burden of production

shifts to Defendant to rebut Plaintiff's claim by articulating a legitimate, non-discriminatory reason for the conduct.  <u>Cornwell</u>, 439 F.3d at 1028

### b.   Defendant's Rationale

The Court finds that Defendant has articulated legitimate, non-discriminatory reasons for Plaintiff's detail to the Teen Center.

First, Defendant asserts that Plaintiff was detailed to the Teen Center because of the poor financial situation at Outdoor Recreation, which Plaintiff was supervising.  <u>See</u> Motion for Summary Judgment at 24; Hollywood Decl. at 4.  Outdoor Recreation yielded operating losses of -12% NIAD for fiscal year 2003 (October 1, 2002 to September 30, 2003) and of -22% NIAD for the first fiscal quarter of 2004 (October 1, 2003 to December 2003).  <u>See</u> Motion for Summary Judgment at 23-24; Penman Decl. at 2.  According to Defendant, the Outdoor Recreation activity was expected to generate revenue and Hickam Air Force Base's higher headquarters had a revenue goal of 7-25% NIAD profit for Hickam's Outdoor Recreation activity.  <u>See</u> Penman Decl. at 1-2.

Second, Defendant asserts that Plaintiff was detailed to the Teen Center because Plaintiff lacked understanding of basic personnel concepts.  <u>See</u> Motion for Summary Judgment at 24; Hollywood Decl. at 4.  In particular, Plaintiff's proposal to

consolidate two part-time appropriated lifeguards into one position using a "business based action" concerned her supervisor because her supervisor understood a "business based action" to apply to non-appropriated fund personnel only (which these were not) and taking such action would actually worsen the financial picture.  See Hollywood Decl. at 3; Motion for Summary Judgment, Exhibit 9; Declaration of Jan Kuniyoshi at 2 (June 2, 2006) ("Kuniyoshi Decl.").

Third, Defendant asserts that Plaintiff was detailed to the Teen Center because Plaintiff's supervisors had concerns about her management style based on negative comments they had received from a 2002 Unit Climate Assessment and from current and past employees.  See Motion for Summary Judgment at 24; Hollywood Decl. at 2-3.

Based on the foregoing, the Court finds that Defendant has submitted evidence showing that Defendant detailed Plaintiff to the Teen Center for legitimate, nondiscriminatory reasons. See Cornwell, 439 F.3d at 1028.

### c.   Plaintiff's Rebuttal

Under the McDonnell Douglas framework, the burden now shifts back to Plaintiff to defeat summary judgment by satisfying the usual standard of proof required in civil cases under Rule 56(c).  Cornwell, 439 F.3d at 1028.  Summary judgment is not appropriate if, based on the evidence in the record, a reasonable

jury could conclude by a preponderance of the evidence that Defendant undertook the challenged employment action because of Plaintiff's race, color and/or national origin.   Id.

To meet this standard of proof, Plaintiff must offer direct or circumstantial evidence that either "a discriminatory reason more likely motivated the employer" to engage in disparate treatment, Cornwell, 439 F.3d at 1028, or that the "employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256.  Under this second method (that the employer's proffered explanation is unworthy of credence), Plaintiff may defeat the motion for summary judgment by offering proof that the employer's legitimate, nondiscriminatory reason is actually a pretext for discrimination.  Cornwell, 439 F.3d at 1028.[18]

The Court finds that Plaintiff has presented substantial and specific circumstantial evidence to create a genuine issue of material fact as to whether a discriminatory

---

[18]/As discussed, supra footnote 13, the Ninth Circuit has recently identified a tension in its current jurisprudence as to the quality of circumstantial evidence required for plaintiffs to survive summary judgment in Title VII employment discrimination cases where plaintiffs have not presented direct evidence. Cornwell, 439 F.3d at 1030-31.  In this case, the Court need not reach the issue of whether a plaintiff can survive summary judgment with circumstantial evidence that is not "substantial and specific" because, as discussed herein, the Court finds that Plaintiff has presented substantial and specific circumstantial evidence of discriminatory motive and pretext.  Cornwell, 439 F.3d at 1031 (declining to determine whether specific and substantial circumstantial evidence is required to avoid summary judgment where plaintiff in fact presented specific and substantial circumstantial evidence).

reason more likely motivated Defendant to engage in disparate treatment and whether Defendant's explanation is pretextual.[19]

The record would permit a fact finder's inference that Defendant treated Plaintiff differently than Caucasian employees because of Plaintiff's race, color and national origin.  First, Hollywood's alleged peppering of Plaintiff with questions about her background when they initially met raises at least some question of whether Hollywood held a racial bias; Hollywood asked Plaintiff: "Are you Hawaiian, what is your nationality . . . Are you from here?  What school did you go to?  Did you go to public school or private school?  Did you go to Punahou?"  See Sussel Decl. at 9; see also Hollywood Decl. at 2.  Similarly, Hollywood's subsequent question to a non-Caucasian in a meeting of "How many haoles do you have on staff?" raises at least some question of whether Hollywood held a racial bias.  See Sussel Decl. at 11.

Second, at least some Caucasian activity managers whose activities operated at a loss were not detailed to less desirable positions, but Plaintiff was detailed to a less desirable position.  See, supra, Section III.B.1.a.iv. (Similarly Situated Individuals Outside of Plaintiff's Protected Class and Other

---

[19]Plaintiff has not offered any direct evidence of discriminatory motive or pretext.  Coghlan, 413 F.3d at 1095 (direct evidence of discrimination "proves the fact [of discriminatory animus] without inference or presumption").

Circumstances).  See also Cornwell, 439 F.3d at 1032 (where plaintiff was only African-American member of management team and only executive who was demoted, this and other evidence raised genuine issue of whether a discriminatory reason motivated defendant to engage in disparate treatment).

Third, when Hollywood detailed Plaintiff to the Teen Center, she replaced Plaintiff in Outdoor Recreation with a Caucasian employee who, according to evidence submitted by Plaintiff, did not possess all of the appropriate water safety certifications.  See Sussel Decl. at 28; Declaration of Amy Cawvey at 4-7, 10 (July 17, 2006) ("Cawvey Decl."); see also Plaintiff's MSJ Concise Statement, Exhibit C at 35-36.  A genuine issue of material fact exists as to whether Klembara was qualified to manage Outdoor Recreation.  See Sussel Decl. at 28; Cawvey Decl. at 4-7, 10; Plaintiff's MSJ Concise Statement, Exhibit C at 35-36; Hollywood Decl. at 4.

Fourth, Plaintiff has submitted evidence that Hollywood engaged in a series of other actions that could be viewed as evidence that racial/color/national origin discrimination likely motivated Defendant to treat Plaintiff differently than Caucasian employees.  For example, Plaintiff has submitted some evidence that Hollywood sought to hire Caucasian employees while blocking the hiring of non-Caucasian employees.  See Sussel Decl. at 6-7, 11-17; Plaintiff's MSJ Concise Statement, Exhibit BB (Hileman's

37

recommendation that Eddy Mentzer, a Caucasian, be hired for an open position), Exhibit CC (Hollywood's email regarding doing a management reassignment to put Mentzer into an open GS-10 position), Exhibit DD (Sussel's recommendation for Tamafaiga Tuiteleleapaga, a non-Caucasian, to the open GS-10 position) and Exhibit UU (Hollywood's email requesting that Howard Pittman's hiring to the GS-7 position is not processed).  In fact, an internal investigation conducted by the Air Force determined that Hollywood discriminated against Pittman (a non-Caucasian) when she canceled Plaintiff's decision to hire Pittman, and hired a Caucasian lifeguard instead.  <u>See</u> Plaintiff's MSJ Concise Statement, Exhibit C at 44-48.  That internal investigation also found that Hollywood "relied upon white lifeguards for counsel and did not solicit the same information from Pacific Islander lifeguards."  <u>Id.</u> at 47.  Defendant disputes this evidence, but Plaintiff has presented sufficient evidence to raise a genuine issue of material fact.  <u>See, e.g.</u>, Hollywood Decl. at 1-5.

While a jury considering all of the evidence could find that a discriminatory reason did not motivate Defendant's decision to detail Plaintiff to the Teen Center, a reasonable jury could also infer that Defendant detailed Plaintiff for discriminatory purposes.  <u>See</u> <u>Cornwell</u>, 439 F.3d at 1032.

Likewise, a reasonable jury could infer from this same evidence that Defendant's explanation for Plaintiff's detail to

the Teen Center was a pretext for discrimination: Hollywood peppered Plaintiff with questions about her race and national origin when they first met; Hollywood asked other employees how many Caucasian ("haole") employees were on staff; Hollywood brought in a Caucasian manager less experienced in outdoor recreation and water activity to replace Plaintiff as manager of Outdoor Recreation; and other activity managers whose activities operated at losses were not detailed or subjected to any adverse employment actions.

Additional evidence of pretext is the date of the Unit Climate Assessment.  Defendant has stated that part of its rationale for detailing Plaintiff was the negative comments contained in a 2002 Unit Climate Assessment; however, Plaintiff has presented evidence that the Unit Climate Assessment was conducted before Plaintiff became the chief of Outdoor Recreation in 2003.  See Sussel Decl. at 5 (Plaintiff became chief of outdoor recreation in 2003); Plaintiff's MSJ Concise Statement, Exhibit B at 1 (Unit Climate Assessment dated August 26, 2002 and conducted from July 8-19, 2002); see also Hollywood Decl. at 2. Thus, Plaintiff has raised a genuine issue of material fact as to whether the complaints about management contained in the 2002 Unit Climate Assessment could have reflected poorly on Plaintiff.

A reasonable jury could rely on this substantial and specific circumstantial evidence to find that Defendant's

proffered explanation for detailing Plaintiff to the Teen Center is unworthy of credence.  See Cornwell, 439 F.3d at 1032-1033.

The Court holds that Defendant is not entitled to judgement as a matter of law on the issue of whether Defendant's detailing of Plaintiff to the Teen Center constituted unlawful disparate treatment on the basis of race, color, and/or national origin because Plaintiff has raised genuine issues of fact as to whether a discriminatory reason more likely motivated Defendant to engage in disparate treatment and whether Defendant's explanation is pretextual.

**2.    Disparate Treatment Based on Race, Color and National Origin: Termination**

In addition to alleging disparate treatment for her detail to the Teen Center, Plaintiff alleges that she was subjected to disparate treatment based on race, color, and national origin when she was terminated from employment effective March 3, 2005.  The McDonnell Douglas analysis outlined above applies to this claim.

**a.    Prima Facie Case**

**i.    Protected Class and Adverse Employment Action**

For the same reasons described above with respect to the first element, the Court finds that Plaintiff satisfies the first element of the prima facie case because she belongs to a protected class.

Plaintiff satisfies the third element of the prima facie case because Plaintiff suffered a second adverse employment action when she was terminated from federal employment effective March 3, 2005. <u>See</u> Motion for Summary Judgment at Ex. 18. Defendant admits that Plaintiff's termination was an adverse employment action. <u>See</u> Motion for Summary Judgment at 38 ("Plaintiff's removal was an adverse employment action").

### ii.   Performance According to Expectations

Given the minimal standard of proof required at the prima facie stage, the Court finds that Plaintiff has demonstrated (for purposes of establishing a prima facie case) that she was qualified for her job and was performing her job according to her employer's legitimate expectations.  As discussed above, Plaintiff has put forth evidence that she was qualified to manage Outdoor Recreation and was performing her job according to legitimate expectations prior to being detailed to the Teen Center on or about January 6, 2004.

Plaintiff took an extended sick leave beginning January 7, 2004 and continuing until the time of her termination in March 2005.  The parties agree that when Plaintiff was requested to provide medical documentation in January 2004, she provided the requested documentation. <u>See</u> Hodge Decl. at 2; <u>see also</u> Motion for Summary Judgment, Exhibit 15 (Air Force Instruction 36-815 regarding absence and leave policy).  The parties agree also that

41

from January 7, 2004 until September 1, 2004, Plaintiff was on approved sick leave status.  See Motion for Summary Judgment, Exhibit 16.

In late August 2004, Plaintiff requested approval of advanced sick leave to commence when all of her regular sick leave and annual leave were depleted.  See Faria Decl. at 2; Plaintiff's MSJ Concise Statement, Exhibit TT at 1.  Plaintiff has submitted some evidence that she was suffering from medical conditions that prevented her from working (for example, severe stress and anxiety, nightmares about the workplace, upset stomach, hives, and insomnia).  See Sussel Decl. at 52-55. Plaintiff has also provided evidence that she submitted additional medical documentation in July 2004 substantiating her inability to return to work.  See id. at 54.  Despite that medical documentation, on or around September 17, 2004, Faria wrote Plaintiff a letter denying her request for advanced sick leave and informing Plaintiff that she was placed on absent without leave ("AWOL") status as of September 2, 2004.  See Faria Decl. at 2.

Beginning on December 1, 2004, Plaintiff was granted twelve weeks of unpaid leave under the Family and Medical Leave Act ("FMLA").  See Declaration of Kathryn Shojinaga at 1 (May 25, 2006 ("Shojinaga Decl.").  The parties have not enlightened the Court as to when Plaintiff's application for leave under FMLA was

42

made, why it was not retroactive to September 2, 2004, or whether the FMLA leave was intended to cure any past absences.

On December 20, 2004, Faria wrote Plaintiff a letter notifying Plaintiff that Faria was proposing to remove her from federal service for excessive AWOL and her failure to report to work as ordered on two dates in November and December.  See Faria Decl. at 2; see also Motion for Summary Judgment, Exhibit 16.  On March 3, 2005, Hileman wrote Plaintiff a letter informing her that he had decided to remove her from employment, effective March 4, 2005.  See Motion for Summary Judgment, Exhibit 18.

Although this case presents a close call, the Court finds that Plaintiff has submitted evidence raising a genuine issue of material fact as to whether she was performing according to legitimate expectations at the time she was terminated.  As discussed, Plaintiff has presented evidence that she was unable to work because of various medical conditions, that she was under doctors' treatment for the conditions, and that she submitted medical documentation supporting her requests for leave.  As a result, she was granted approved leave for the first eight months of her illness, denied leave for the next three months, but then granted three additional months of approved leave.  If Plaintiff was legitimately ill and submitting proper medical documentation as she alleges, then she has raised an issue of fact as to whether she was performing according to legitimate expectations.

43

The Court finds that for purposes of establishing a prima facie case, Plaintiff has met the minimal burden of proof required to demonstrate that she was performing according to legitimate expectations.

### iii. Similarly Situated Individuals Outside of Plaintiff's Protected Class and Other Circumstances

Plaintiff has offered no evidence that any similarly situated individuals outside of her class were treated more favorably.  Plaintiff's only reference to other individuals outside of her class who took sick leave is a general statement that to her knowledge, "no Caucasian employees were given ultimatums of 'possible termination' if they did not submit all medical documentation."  Sussel Decl. at 42.  Plaintiff has, however, demonstrated that "other circumstances surrounding the adverse employment action give rise to an inference of discrimination."  See Fonseca, 374 F.3d at 847.  Those particular circumstances are examined in detail, supra, in section III.B.1.c. (Plaintiff's Rebuttal) and, infra, in section III.B.4.a.iii. (Plaintiff's Rebuttal).

As previously noted, the requisite degree of proof necessary to establish a prima facie case for Title VII claims on summary judgment is minimal and does not even rise to the level of a preponderance of the evidence.  Coughlan, 413 F.3d at 1094. Given this minimal standard and drawing inferences in Plaintiff's

favor, the Court holds that the circumstances surrounding the adverse employment action give rise to an inference of discrimination sufficient to establish the fourth prong of Plaintiff's prima facie case.  <u>Fonseca</u>, 374 F.3d at 849.

### b.   Defendant's Rationale

Defendant has articulated a legitimate, non-retaliatory rationale for Plaintiff's termination: Plaintiff was AWOL for some period of time, she did not report to work as ordered, and she failed to communicate with her supervisor (Faria).  <u>See</u> Faria Decl. at 2; Hileman Decl. at 1.

### c.   Plaintiff's Rebuttal

For the same reasons discussed, <u>supra</u>, regarding Plaintiff's rebuttal of Defendant's rationale regarding Plaintiff's detail to the Teen Center, and <u>infra</u>, regarding Plaintiff's rebuttal of Defendant's rationale regarding Plaintiff's termination, the Court holds that Defendant is not entitled to judgment as a matter of law on the issue of whether Plaintiff's termination constituted unlawful disparate treatment on the basis of race, color, and/or national origin.  <u>See</u>, <u>supra</u>, section III.B.1.c.; <u>infra</u>, section III.B.4.a.iii.

Additionally, the evidence that Defendant acted with a discriminatory motive when it detailed Plaintiff, and the evidence that Defendant's proffered rationale for the detail is pretextual, also support Plaintiff's showing of discriminatory

45

motive and pretext with respect to the termination because the
evidence supports an inference that Defendant had discriminated
against Plaintiff up until the time she was detailed and perhaps
would continue to discriminate against her after she was
detailed.  Questions of fact as to discriminatory motive and
pretext are also raised because, according to Plaintiff's
evidence as described infra: Hollywood wanted Plaintiff's
replacement at Outdoor Recreation to stay for longer than 120
days, and therefore would not want Plaintiff to return to Outdoor
Recreation after her 120 day detail; Hollywood bad mouthed
Plaintiff to other employees, again indicating that she did not
want Plaintiff to return to Outdoor Recreation; Klembara shredded
Plaintiff's files; Hodge demanded that Plaintiff provide
extensive medical records within a twenty-four hour time frame
or face placement on AWOL; Faria demanded Plaintiff report to
work despite her approved leave status in December 2004, and
notified Plaintiff that he proposed to terminate her based in
part on her failure to report to work on a date for which she was
on approved leave.  See, infra, sections III.B.4.a.i.c. and
III.B.4.a.iii.

        The Court finds that Plaintiff has raised a genuine
issue of fact as to whether a discriminatory reason more likely
motivated Defendant to engage in disparate treatment and whether
Defendant's explanation is pretextual.  Accordingly, the Court

denies summary judgment on Plaintiff's claim for disparate treatment based on race, color, or national origin for Plaintiff's termination.

> **3.   Hostile Work Environment Based on Race, Color, National Origin, and Gender**

"A hostile work environment requires the existence of severe or pervasive and unwelcome verbal or physical harassment because of a plaintiff's membership in a protected class." Sischo-Nownejad v. Merced Community College Dist., 934 F.2d 1104, 1109 (9th Cir. 1991) (superceded by statute on other grounds). The working environment must both subjectively and objectively be perceived as abusive.  Vasquez, 349 F.3d at 642.  "Courts are to determine whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Kortan v. California Youth Authority, 217 F.3d 1104, 1110 (9th Cir. 2000) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)); see also Vasquez, 349 F.3d at 642.

Specifically, an employee may prove the existence of a hostile work environment under Title VII by showing (1) that she was subjected to verbal or physical conduct of a racial or sexual

nature, (2) that this conduct was unwelcome, and (3) that the
conduct was sufficiently severe or pervasive to alter the
conditions of the victim's employment and create an abusive
working environment.  <u>Vasquez</u>,349 F.3d at 642; <u>Pavon v. Swift
Transportation Co., Inc.</u>, 192 F.3d 902, 908 (9th Cir. 1999)
(<u>citing</u> <u>Meritor Savings Bank, FSB v. Vinson</u>, 477 U.S. 57, 67
(1986)).

Plaintiff offers only three verbal statements of a
racial or sexual nature.  First, when Hollywood met Plaintiff in
November 2003, she asked about Plaintiff's background.  According
to Plaintiff, Hollywood asked: "Are you Hawaiian, what is your
nationality . . . Are you from here?  What school did you go to?
Did you go to public school or private school?  Did you go to
Punahou?"  <u>See</u> Sussel Decl. at 9; <u>see also</u> Hollywood Decl. at 2.
Second, Plaintiff provides evidence that Hollywood asked
employees in December 2003, "How many haoles do you have on
staff?"  <u>See</u> Sussel Decl. at 11.[20]  Third, Plaintiff has
presented evidence that in a meeting with Faria, Hollywood, and
Hileman on January 6, 2004, Faria stated about Plaintiff's
relationship with an employee: "Your staff thinks you're so close
you're in bed together."  <u>See</u> Sussel Decl. at 25.

_____

[20]This statement was made outside of Plaintiff's presence
but Plaintiff presents evidence that she was informed of the
statement and that it contributed to her work environment.  <u>See</u>
Sussel Decl. at 11-12.

These three statements were not so sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.  See Vasquez, 349 F.3d at 642-644 (two isolated offensive remarks, combined with other complaints about unfair treatment, did not create an abusive work environment).  The statements were not frequent, occurring at the rate of approximately once per month; the statements were not severe; the statements may have been offensive, but they were not objectively or subjectively physically threatening or objectively humiliating.  Id.; see also, e.g., Kortan v. California Youth Authority, 217 F.3d 1104, 1107, 1111 (9th Cir. 2000) (conduct was not so pervasive as to interfere with plaintiff's employment where supervisor called female employees "castrating bitches," "Madonnas," "regina," and similar terms on several occasions in plaintiff's presence, supervisor called plaintiff "Rapunzel" and "Medea," plaintiff received postcards at home from the supervisor, and plaintiff had other difficulties with supervisor).[21]

---

[21]Plaintiff alleges no specific physical conduct of a racial or sexual nature.  The only conduct to which Plaintiff points is the general conduct described in this Court's discussion of Plaintiff's disparate treatment claims, including allegations that Hollywood blocked Plaintiff's hiring of employees.  The Court finds that even if such conduct was racial or sexual in nature, it was not so severe or pervasive - when coupled with the explicit verbal statements discussed - to alter the conditions of Plaintiff's employment and create an abusive working environment.

Accordingly, the Court grants Defendants' Motion for Summary Judgment on Plaintiff's hostile work environment charge under Title VII.

### 4.   Retaliation

"Title VII's anti-retaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405, 2410 (2006) (quoting 42 U.S.C. § 2000e-3(a)). The anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm. Burlington Northern, 126 S. Ct. at 2414.

Retaliation may be shown using the McDonnell Douglas burden shifting framework described above. McGinest, 360 F.3d at 1124. To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) she engaged in a protected activity; (2) an adverse action was thereafter taken against her; and (3) a causal link existed between the two events. See Vasquez, 349 F.3d at 646; McGinest, 360 F.3d at 1124; see also Burlington Northern, 126 S. Ct. at 2413-14 (scope of anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm; anti-retaliation

provision is not limited to discriminatory actions that affect the terms and conditions of employment).

To meet the second prong, a plaintiff must show that "a reasonable employee would have found the challenged action materially adverse." Burlington Northern, at 2415.  For example, an action would be materially adverse if it dissuaded a reasonable worker from making or supporting a charge of discrimination.  Id.

If a prima facie case is established, the burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for its action; if the employer sets forth such a reason, the plaintiff then bears the ultimate burden of submitting evidence indicating that the employer's proffered reason is merely a pretext for a retaliatory motive.  Porter, 419 F.3d at 894; McGinest, 360 F.3d at 1124.

### a.   Termination

Plaintiff has established a prima facie case that she was terminated in retaliation for her EEOC complaint and/or complaint to the congressional delegation.

### i.   Prima Facie Case

### (a)   Protected Activity

Plaintiff made an EEOC complaint of employment discrimination on January 6, 2004.  See Defendant's Motion for Summary Judgment, Exhibit 2 at 195-197; see also Defendants MSJ

Concise Statement at 4 ¶ 26; Plaintiff's MSJ Concise Statement at 2 ¶ 26.  Plaintiff complained to Hawaii's congressional delegation about employment discrimination on January 9, 2004.  See Sussel Decl. at 36; Plaintiff's MSJ Concise Statement, Exhibit HH at 2.  Plaintiff has demonstrated that she engaged in protected activity when she made these two complaints.  See McGinest, 360 F.3d at 1124 n.19.  Defendant does not dispute that Plaintiff engaged in these protected activities.  See Motion for Summary Judgment at 40-41.

### (b)  Adverse Action

Plaintiff has demonstrated that an adverse action was thereafter taken against her when she was terminated from employment because "a reasonable employee would have found the [termination] materially adverse."  Burlington Northern, 126 S. Ct. at 2415.  Defendant does not dispute that Plaintiff's termination was an adverse action.  See Motion for Summary Judgment at 40-41.

### (c)  Causal Link

For purposes of establishing a prima facie case of retaliation, Plaintiff has demonstrated a causal link between the complaints and her termination.  See Porter, 419 F.3d at 894-895; McGinest, 360 F.3d at 1124-25.  In this case, causation can be inferred from the "circumstantial evidence of a 'pattern of antagonism' following the protected conduct."  Porter, 419 F.3d

at 895 (citing <u>Kachmar v. SunGard Data Sys., Inc.</u>, 109 F.3d 173, 177 (3d Cir. 1997)).

First, Plaintiff has presented evidence to raise a genuine issue of material fact as to whether Hollywood somehow modified (or sought to modify) Plaintiff's detail to the Teen Center from 120 days to more than 120 days as a result of Plaintiff's complaint to the EEOC.  According to Plaintiff, Hollywood told her on January 6, 2004 that she would be detailed to the Teen Center for only "120 days."  <u>See</u> Sussel Decl. at 28. Plaintiff complained to the EEOC later that day, January 6, 2004. <u>See</u> Defendant's Motion for Summary Judgment, Exhibit 2 at 195- 197; <u>see also</u> Defendants MSJ Concise Statement at 4 ¶ 26; Plaintiff's MSJ Concise Statement at 2 ¶ 26.  At a staff meeting on January 8, 2004, Hollywood stated that Plaintiff's replacement (Julie Klembara) was "out here for 120 days, longer if I can keep her," inferring that Plaintiff would not return to Outdoor Recreation after 120 days had passed.  <u>See</u> Plaintiff's MSJ Concise Statement, Exhibit RR at 8; <u>see also</u> Hollywood Decl. at 4 (on January 7, 2004, Plaintiff was detailed to the Teen Center for "a minimum of 120 days").  This evidence supports Plaintiff's establishment of causation, for purposes of establishing a prima facie case, because if Hollywood did seek to modify Plaintiff's detail after she complained to the EEOC, it would represent the first instance in a pattern of antagonism after Plaintiff's

complaint.  See Porter, 419 F.3d at 895-896.

Second, Plaintiff has submitted evidence that after she complained to the EEOC, Hollywood began bad mouthing Plaintiff to Outdoor Recreation employees.  For example, at the staff meeting on January 8, 2004, Hollywood made comments that could be construed as criticism of Plaintiff and Plaintiff's management of Outdoor Recreation.  See Plaintiff's MSJ Concise Statement, Exhibit RR at 2-8.

Third, Plaintiff has submitted evidence that Klembara shredded several years of Plaintiff's files in late January and February 2004, after Klembara began her detail as chief of Outdoor Recreation.  See Sussel Decl. at 20, 36.  Such action could be construed as antagonistic towards Plaintiff, and could indicate that management never expected Plaintiff to return to her position at Outdoor Recreation and/or that Plaintiff's files contained information that management did not want released (whether to the EEOC or others).

Fourth, Plaintiff has presented evidence that Hodge aggressively sought extensive medical records from Plaintiff in late January 2004.  See Sussel Decl. at 38-42.  According to Plaintiff, Hodge gave Plaintiff only 24-hours to provide in depth medical information (e.g., history of all medical exams, response to treatment, clinical findings, lab tests, psych assessments, explanation of medical basis) and threatened to place Plaintiff

on AWOL status if Plaintiff did not comply within that 24-hour period. Id. at 38-39. According to Plaintiff, Hodge was threatening, condescending, and harassing. Id.; see also id. at 44-45. Although Defendant disputes Plaintiff's account, Plaintiff has provided sufficient evidence to raise a genuine issue of material fact to support her prima facie case. See Porter, 419 F.3d at 896.[22]

Fifth, Faria directed Plaintiff to report to work on December 1, 2004, even if she was on approved leave under the Family Medical Leave Act. See Motion for Summary Judgment, Exhibit 16 at 2; see also Faria Decl. at 2; Shojinaga Decl. at 1. A fact finder could infer this demand to be antagonistic, since a fact finder could infer such a request to be unusual when an employee is on approved medical leave. Furthermore, in the letter Faria wrote to Plaintiff on December 20, 2004, Faria included Plaintiff's failure to report to work on December 1, 2004 as one of the reasons that he was proposing to remove her from federal service, despite the fact that Plaintiff was on

_____

[22]Additionally, according to Plaintiff, her husband (Kenneth Sussel) was in the Air Force and took various leave slips and/or medical documents to Hodge's office on Plaintiff's behalf. See Sussel Decl. at 38; Declaration of Kenneth R. Sussel at 1-2 (July 26, 2006). Hileman complained to Mr. Sussel's supervisor about Mr. Sussel's allegedly inappropriate demeanor and verbal abuse when dropping off documents for Hodge. See Plaintiff's MSJ Concise Statement, Exhibit LL. A fact finder could infer that this complaint against Mr. Sussel further demonstrates a pattern of antagonism against Plaintiff.

approved leave at that time.  See Motion for Summary Judgment, Exhibit 16; see also Faria Decl. at 2.

Faria's letter on December 20, 2004 notified Plaintiff of his proposal to remove her from employment in thirty days. See Motion for Summary Judgment, Exhibit 16.  Thus, more than eleven months passed between Plaintiff's complaints to the EEOC and congressional delegation and her notice of proposed termination.  Although this timing alone may be too remote to establish a causal link, the aforementioned circumstantial evidence supports the inference of causation because it demonstrates - for purposes of establishing a prima facie case - a pattern of antagonism following Plaintiff's protected conduct. See Porter, 419 F.3d 895-896.  Accordingly, Plaintiff has established a prima facie case that her termination was in retaliation for her protected activity.

### ii.  Defendant's Rationale

Defendant has articulated a legitimate, non-retaliatory rationale for Plaintiff's termination: Plaintiff was AWOL for some period of time, she did not report to work as ordered, and she failed to communicate with her supervisor (Faria).  See Faria Decl. at 2; Hileman Decl. at 1.

### iii. Plaintiff's Rebuttal

Plaintiff has submitted evidence raising a genuine issue of material fact as to whether Defendant's proffered

rationale for her termination is a pretext for a retaliatory motive.  <u>Porter</u>, 419 F.3d at 894.[23/]  Should a fact finder resolve some or all of these issues of fact in Plaintiff's favor, the fact finder could infer pretext.  For example, according to Plaintiff's evidence, once she complained to the EEOC, her detail (which, according to Plaintiff, was punitive in nature and in effect a demotion) went from a temporary term of a maximum of 120 days to a longer term of a minimum of 120 days.  After the EEOC complaint, according to Plaintiff's evidence, Hollywood began bad mouthing Plaintiff to other employees and Klembara started shredding Plaintiff's files.  Plaintiff has submitted evidence that Hodge then demanded that Plaintiff provide extensive medical records to justify her sick leave, and threatened that Plaintiff would be placed on AWOL status if those records were not provided within twenty-four hours.  Furthermore, Plaintiff has submitted evidence that Faria demanded Plaintiff report to work despite her approved leave status in December 2004, and notified Plaintiff that he proposed to terminate her based in part on her failure to report to work on a date for which she was on approved leave.

In summary, the Court finds that Defendant is not entitled to summary judgment on Plaintiff's claim that she was terminated from employment in retaliation for her complaints to

---

[23/]The Court notes that Plaintiff's circumstantial evidence is both substantial and specific.  <u>See</u>, <u>supra</u>, footnotes 13 and 18.

the EEOC and to her congressional representatives.

### b.   January 6 Decision to Detail Plaintiff

To the extent that Plaintiff may be claiming that the decision to detail her to the Teen Center (as communicated to her on January 6, 2004) was unlawful retaliation, Plaintiff's claim fails because of timing.

Plaintiff was informed of her detail to the Teen Center at a meeting with Hollywood, Faria, and Hileman on January 6, 2004.  See Sussel Decl. at 19, 28.  Plaintiff made an EEOC complaint on January 6, 2004, after the meeting with Hollywood, Faria, and Hileman.  See Defendant's Motion for Summary Judgment, Exhibit 2 at 195-197.  Plaintiff complained to Hawaii's congressional delegation on January 9, 2004.  See Sussel Decl. at 36.  Therefore, the initial decision to detail Plaintiff, as communicated to her on January 6, 2004, could not have been made in retaliation for the complaints.  See McGinest, 360 F.3d at 1124 (to establish prima facie case of retaliation, the adverse employment action must be taken after the protected activity).

Moreover, Plaintiff has previously admitted that the first time she raised concerns to anyone about Hollywood discriminating against people on the basis of their race, color, or national origin was at the EEOC office on January 6, 2004, after her meeting with Hollywood, Faria, and Hileman.  See Defendant's Motion for Summary Judgment, Exhibit 2 at 195-197.

58

Plaintiff identifies no protected activity that occurred prior to that meeting and has admitted that she did not voice any concern to Hollywood or Faria about racial discrimination.  Id.  The general statement in Plaintiff's declaration that "[b]y December 2003, I had made it clear that I would select hires based upon their qualifications" does not indicate that she had undertaken any protected activity under Title VII; rather, that statement supports Plaintiff's earlier statement that she may have sent an email to Faria questioning employees' (or potential employees') qualifications, but did not raise the issue of race or discrimination in that email or elsewhere.  See Sussel Decl. at 16; Defendant's Motion for Summary Judgment, Exhibit 2 at 196.  Such an email regarding general qualifications (but not race, color, gender, or national origin) is not "opposition" to a practice that Title VII forbids.  See 42 U.S.C. § 2000e-3(a); see also Burlington Northern, 126 S. Ct. at 2410.

For these reasons, Plaintiff has not established a prima facie case that the original decision to detail her to the Teen Center was unlawful retaliation.

### c.    Alleged Decision to Alter the Detail

To the extent that Plaintiff may be claiming that she was originally informed that her detail would be a maximum of 120 days, but that after she complained to the EEOC, a decision was made to change that detail to a period longer than 120 days,

Defendant is not entitled to summary judgment on Plaintiff's retaliation claim.  As discussed _supra_, Plaintiff has submitted evidence raising a genuine issue of material fact as to whether Hollywood changed the terms of Plaintiff's detail after Plaintiff complained to the EEOC on January 6, 2004.  In other words, Plaintiff has raised a genuine issue of material fact as to whether she suffered an adverse employment action.[24/]

For the same reasons discussed _supra_ regarding Plaintiff's claim that she was terminated in retaliation for her protected activity, the Court finds that Defendant is not entitled to summary judgment on Plaintiff's claim that Hollywood allegedly modified her detail to the Teen Center in retaliation for her complaints to the EEOC and congressional delegation. Plaintiff has established genuine issues of material fact supporting her prima face case of retaliation and rebutting Defendant's proffered rationale.

### 5.  Other Gender Claims

The Court has already determined that Defendant is entitled to summary judgment on Plaintiff's claim of a hostile

---

[24/]The Court notes that Plaintiff has submitted evidence that she was injured by the alleged decision to modify her detail. For example, Plaintiff alleges that she suffered anxiety, depression, stress, insomnia, and hives as a result of "the entire nightmare" that happened with her job at Outdoor Recreation, which would presumably include the alleged decision to modify her detail to the Teen Center.  _See, e.g._, Sussel Decl. at 48.

work environment based on gender, race, color, and national origin.  To the extent that the First Amended Complaint could be interpreted to allege additional claims under Title VII related to gender (such as for retaliation based on gender, quid-pro-quo sexual harassment, or disparate treatment based on gender), Defendant is entitled to summary judgment on those claims as well.

With respect to a claim of disparate treatment based on gender, Plaintiff's Opposition to the Motion for Summary Judgment does not address it in any detail, focusing instead on race. Under the disparate treatment analysis outlined herein, even if Plaintiff has established a prima facie case of disparate treatment based on gender, Plaintiff has not rebutted Defendant's legitimate, nondiscriminatory rationale for detailing Plaintiff to the Teen Center.  Plaintiff's only gender-related evidence in rebuttal of the legitimate rationale is a statement by Faria (regarding Plaintiff's relationship with an employee) that: "Your staff thinks you're so close you're in bed together."  See Sussel Decl. at 25.  This statement is not indicative of discriminatory motive or pretext.

Additionally, Plaintiff's evidence that a similarly situated male individual (Guthrie) was treated more favorably than Plaintiff is not helpful to Plaintiff's case in this gender context because Plaintiff has also submitted evidence that

similarly situated females (i.e., individuals within Plaintiff's protected class) were treated more favorably than Plaintiff. See, supra, section III.B.1.a.iv. ("Similarly Situated Individuals Outside of Plaintiff's Protected Class and Other Circumstances").  Moreover, Hollywood (of whom Plaintiff primarily complains) and Klembara (who replaced Plaintiff at Outdoor Recreation) are also women.  The Court finds that, with regard to gender, Plaintiff has not raised a genuine issue of material fact to rebut Defendant's proffered rationale; Plaintiff has not submitted evidence that a gender-related discriminatory reason likely motivated the employer to engage in disparate treatment or that Defendant's proffered rationale is a pretext for gender discrimination.  Cornwell, 439 F.3d at 1028.

With respect to any claims for quid-pro-quo sexual harassment and/or retaliation based on gender, Plaintiff's Opposition to the Motion for Summary Judgment does not address those claims or oppose Defendant's argument for summary judgment on those claims.[25/]  For these reasons, the Court finds that summary judgment is appropriate.

Accordingly, the Court grants summary judgment to Defendant on all remaining gender-related claims under Title VII.

---

[25/]At the hearing, Plaintiff's counsel confirmed that the only gender claims Plaintiff asserts are hostile work environment and disparate treatment based on gender.

## IV.  Conclusion

The Court grants in part and denies in part Defendant's Motion for Partial Dismissal.  The Court grants dismissal without prejudice of any claim for violation of the Rehabilitation Act that may be contained in the First Amended Complaint.  The Court denies the Motion for Partial Dismissal in all other respects.

The Court grants in part and denies in part Defendant's Motion for Summary Judgment.  The Court grants summary judgment to Defendant on Plaintiff's claims (1) for hostile work environment, (2) that the January 6, 2004 decision to detail her was made in retaliation for protected activity, and (3) for any other gender based claims.  The Court denies summary judgment on Plaintiff's claims that (1) she was subjected to disparate treatment on the basis of race, color, and national origin when she was detailed to the Teen Center, (2) she was subjected to disparate treatment on the basis of race, color, and national origin when she was terminated from employment, (3) she was terminated in retaliation for protected activity, and (4) the alleged decision to alter her detail to the Teen Center was made in retaliation for protected activity.  Accordingly, the four claims on which the Court has denied summary judgment remain for trial.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, September 12, 2006.



_____
Alan C. Kay
Sr. United States District Judge